# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KHALIL CHRISTIAN, *et al.*, | : | |
| *Plaintiffs*, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| Sgt. WILLIAM ORR, *et al.*, | : | |
| *Defendants*. | : | No. 08-2397 |
| | : | |

## M E M O R A N D U M

PRATTER, J.                                                                            MARCH 1, 2011

**INTRODUCTION**

Seven Plaintiffs have sued four police officers from Darby Township, from the Borough of Folcroft, and from the Borough of Sharon Hill, as well as Sharon Hill itself, alleging that the officers violated their civil rights in connection with the execution of a warrant to search the Top of the Line Barber Shop ("the Barber Shop" or "the Shop") in Sharon Hill on December 16, 2005.[1]  At the time of the search, Plaintiffs Augustus Collins and Devin Gilliam were barbers at the Shop, and Plaintiff AllanCharles Burton, who was then 13 years old, was working at the Shop in a limited capacity.  The four remaining Plaintiffs – Khalil Christian, Arnette Covert, Devin Covert and DeAndray Covert – were patrons of the Barber Shop.  The Barber Shop caters to a primarily African American clientele, and all of the Plaintiffs here are African Americans.

Specifically, the Plaintiffs allege that Officer Christopher Eiserman of Folcroft, Sergeant Leonard McDevitt of Darby, and Sergeant William Orr and Officer Gerald Scanlan, Jr. of Sharon Hill (collectively, "the Officer Defendants") violated the Plaintiffs' rights under the Fourth and

---

[1]        Darby, Folcroft, and Sharon Hill are contiguous communities in Pennsylvania's Delaware County.

Fourteenth Amendments when they, along with a number of other officers, raided the Barber Shop. All of the officers who participated in the raid are white.[2] The Plaintiffs also assert that Sharon Hill followed unconstitutional policies or customs. The Plaintiffs' entire case proceeds under 42 U.S.C. § 1983, and they have sued Sharon Hill under a *Monell* liability theory.[3]

The five Defendants have filed three Motions for Summary Judgment which would, if granted, dispose of the Complaint in its entirety. For the reasons set forth below, these Motions will denied in part and granted in part, so that summary judgment will be granted for Defendants as to (1) the false arrest claim asserted by Messrs. Collins and Gilliam against the four Officer Defendants; and (2) the *Monell* claim asserted by Messrs. Christian, Collins and Gilliam against Sharon Hill.

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1441(b).

## FACTUAL AND PROCEDURAL BACKGROUND

For the purposes of these motions for summary judgment, the Court considers whether the record presents any genuine issues of material fact that would allow a reasonable jury to find

---

[2] Although this is not a racial discrimination case, as will be explained *infra*, the race of the Plaintiffs and of the Officer Defendants is relevant to understanding the record and the Plaintiffs' claims.

[3] *See Monell v. Department of Social Services*, 436 U.S. 658 (1978) (overruling *Monroe v. Pape*, 365 U.S. 167 (1961), which had held that municipalities are immune from suit under § 1983, and explaining the appropriate basis for a § 1983 claim against a municipality).

for the Plaintiffs.[4]  On that basis, the facts are as follows.

On December 16, 2005, a group of police officers[5] raided the Top of the Line Barber Shop in Sharon Hill, Pennsylvania, pursuant to a facially valid search warrant.[6]  The stated purpose of the raid was to obtain evidence relating to a drug-dealing operation, which the police believed was being conducted from the Barber Shop.  While the raid did not uncover evidence of a substantial drug-dealing operation, the police did recover small amounts of marijuana from the

---

[4]      *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).  At this stage in the litigation, the Court draws all reasonable inferences and resolves conflicting evidence in favor of the Plaintiffs, and does not make credibility determinations.  *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267 (3d Cir. 2010).

[5]      The precise number of officers who participated in the raid is disputed by those who were present.  On the low end of the spectrum, Sergeant McDevitt has said that there were six or seven officers on the entry team.  On the high end, Mr. Christian – who was located in the back of the Shop – has estimated that as many as 15 or 20 officers may have entered.

       Taken as a whole, the record does not support Mr. Christian's supposition that as many as 20 police officers may have been involved in the raid, but it also suggests that Sergeant McDevitt's estimate may be low.  The four Officer Defendants appear to have been joined at some point by at least five other officers – namely, Officers Anthony Buckland, Brian Devaney , Dana McBride and George Faulkner (the last of whom seems to have left early due to illness).

       This case presents an example of the "*Rashomon* effect," named for the classic Akira Kurosawa film in which four witnesses swear to mutually-contradictory versions of the same event.  At this stage in the litigation, however, the Court's role is not to resolve disputes of fact, but instead to identify them and evaluate their materiality.  The Officer Defendants have not denied their own involvement in the raid, and the precise number of other officers who may have accompanied them need not be determined in order to resolve the Motions under consideration.

[6]      As is noted at fn. 5, *supra*, the exact number of officers who participated in the raid is disputed, but is at any rate not immediately relevant to the resolution of these Motions.

       A facially valid warrant is one which has been signed by a detached and neutral magistrate, and which does not suffer from any such deficiencies as would prevent the executing officers from reasonably presuming it to be valid.  *See United States v. Leon*, 468 U.S. 897, 923 (1984) (describing the failure "to particularize the place to be searched or the things to be seized" as one source of facial deficiency).  Although the Plaintiffs have challenged the warrant's *actual* validity, they have not challenged its facial validity.

two barbers, Augustus Collins and Devin Gilliam.[7]  However, Messrs. Collins and Gilliam and five other people who were inside the Shop at the time of the raid have argued that four of the officers who participated in the raid violated their Fourth and Fourteenth Amendment rights in obtaining and executing the search warrant.  In addition, Messrs. Collins and Gilliam, along with one of the Shop's patrons, Khalil Christian, have asserted that they were arrested with excessive force and falsely, and became victims of an unconstitutional strip search policy or custom while detained in the Sharon Hill Police Station.  The Court will review the events giving rise to these claims in roughly chronological order.

In an affidavit of probable cause supporting the warrant to search the Barber Shop, Officer Gerard Scanlan of Sharon Hill stated that he began "periodic surveillance" of the Barber Shop beginning in April of 2005, in response to complaints that "narcotics" were being used and sold on its premises.[8]  Officer Scanlan's affidavit also described two particular instances in which confidential informants had purchased drugs inside the Barber Shop.  According to the affidavit, one informant bought cocaine in the Shop on May 11, 2005, and another bought marijuana in the Shop within 48 hours prior to the issuance of the warrant.[9]

The Plaintiffs have alleged that the second of these purchases – or "controlled buys," in police parlance – was a fabrication.  This challenge is based on documentary evidence that raises questions as to the second buy's timing (and therefore, according to the Plaintiffs, whether it ever

---

[7]        Mr. Gilliam was not a licensed barber, but was cutting hair for money.

[8]        The affidavit and warrant are attached as an exhibit to the Sharon Hill Motion.

[9]        Although cocaine is a "narcotic" under Pennsylvania law, "marijuana is classified in Schedule I, 35 P.S. § 780-104(1)(iv), and it is not a 'narcotic drug' as defined in 35 P.S. § 780-102." *Commonwealth v. Bell*, 645 A.2d 211, 215 at fn. 7 (Pa. 1994).

took place at all), as well as the fact that the only evidence for the second buy is the statements of the three Officer Defendants who claim to have monitored it from outside the Barber Shop.[10]

The documentary evidence is Officer Scanlan's affidavit and search warrant application. The search warrant application appears to be dated December 15, 2005; it describes the "date(s) of violation" (relating to the warrant's issuance) as May 11 to December 15, 2005; and it appears to have been hand-dated by the signing magistrate at 10:15 a.m. on December 16. The Plaintiffs argue that Officer Scanlan's affidavit, which was appended to his warrant application, appears to be hand-dated "10/16/05" (i.e., October 16, 2005) on its first page – and features an ambiguous, and conceivably altered, date on its second.[11] The Plaintiffs also observe that Sergeant Orr – who was Officer Scanlan's supervisor, and one of the three officers who claims to have been present for the second buy – has estimated that the second buy took place between 10:00 a.m. and 12:00 p.m. on December 16.[12] The Plaintiffs argue that this timeline is inconsistent with the issuance of a warrant at 10:15 a.m., and that this contradiction is suggestive of fabulism.

---

[10] Sergeant William Orr and Sergeant Leonard McDevitt indicated in their depositions that they joined Officer Scanlan in monitoring the transaction.

[11] The Court is neither obligated nor equipped to conduct a forensic analysis of what is at any rate merely a photocopy of the original affidavit. In this context, it is enough to observe that the hand-written dates on the version of the affidavit attached to the Sharon Hill Motion are sufficiently ambiguous as to give rise to genuine factual disputes as to the best interpretation of the writing, and whether the dates may have been altered after they were written.
In response to the Plaintiffs' theory regarding the second controlled buy, Officer Scanlan merely emphasizes that officers' affidavits are presumptively valid, and that allegations of deliberate falsehood or reckless disregard for the truth in the procurement of a warrant must be accompanied by specific proof. Sharon Hill Memorandum at 18 (*citing Franks v. Delaware*, 438 U.S. 154, 171-172 (1978)). In his deposition, Officer Scanlan identified the dates as having been written in his own hand, and said that any discrepancies were "mistakes" or "typos."

[12] As for Officer Scanlan's affidavit itself, it does not provide any precise date or time for the second buy, saying only that it took place within 48 hours prior to the affidavit.

The Plaintiffs also note that Sharon Hill has never been able to produce to them the marijuana that was allegedly purchased during the second buy – neither in response to discovery requests made during this litigation, nor during the course of an earlier state criminal prosecution of Messrs. Collins and Gilliam.[13]  In addition, the Plaintiffs observe that none of the three Officer Defendants who were allegedly present for the second controlled buy kept notes on that event, or have described it with particularity (whether based upon direct observations, or upon information they might have gathered from their still-anonymous informant),[14] and that Sharon Hill has not produced serial numbers for bills used in the controlled buy for comparison with $525 in cash that was seized from the Barber Shop during the raid (which took place on the same day that the buy ostensibly occurred).  The Plaintiffs contrast the second buy with the earlier May 11 crack cocaine buy, direct evidence for which includes: (1) the crack cocaine that was purchased; (2) a police department form relating to the processing of these drugs; and (3) contemporaneous notes on the controlled buy taken by Officer Scanlan.[15]

---

[13]　　　That case was terminated in favor of Messrs. Collins and Gilliam after the marijuana seized during the Barber Shop raid was suppressed.  The state court does not appear to have issued any written order setting forth its grounds for suppressing this evidence.

[14]　　　The Plaintiffs note by way of example that the Officers have not been able to supply the name or nickname of the seller, any information about other people who may have been in the Barber Shop when the buy was made, or any information about where the marijuana might have been kept.  Sergeant Orr was able to identify the seller as a black male.

[15]　　　The Plaintiffs have cited Officer Scanlan's notes regarding the May 11 buy as grounds for questioning his reliability, since these notes suggest that the buy took place outside the Barber Shop, whereas his subsequent affidavit indicates that it took place inside.  They also observe that the notes say that the man who sold the drugs to the confidential informant on May 11 was "one of D. Browns [sic] workers" – and propose that this may explain why officers asked the Plaintiffs about "Dee" Brown when Mr. Brown had long since left the Shop, suggesting that the officers were searching based on outdated information as opposed to facts gathered during a controlled buy on the day of the raid.  See the discussion of the warrant execution, *infra*.

The raid on the Barber Shop took place in the late afternoon of December 16, which was a Friday.[16]  When the police entered the Shop, nine people were already present: Messrs. Collins and Gilliam, the two barbers; a 13-year-old boy named AllenCharles Burton, who has said that he worked at the Shop on a part-time basis; Mr. Christian, who has indicated that he was at the Shop waiting for his regular barber; patrons Arnette Covert and her two sons Devon, aged four, and DeAndray, aged seven; and another woman, also a patron, who was with a young boy.[17]  Mr. Collins was standing in the front of the Shop and was cutting the hair of DeAndray Covert, who was seated in a barber's chair.  Arnette and Devon Covert were likewise in the front of the Shop, seated on a bench.  Mr. Christian and AllenCharles Burton were standing in the rear of the Shop. playing a game of pool, and Mr. Gilliam was standing near the pool table and watching.

The first police officer to enter the Barber Shop was Officer Dana McBride of Sharon Hill, who Mr. Collins recognized (although not by name) because the officer had been stationed at a nearby school.  According to Mr. Gilliam, Officer McBride's gun was drawn when she entered the Shop.  She was followed by a group of several male officers, one of whom was in uniform and the others in plain clothes.  Several of the Plaintiffs have said that all of these officers had their guns drawn when they entered the Shop, and that officers pointed guns at all of the adults in the Shop, as well as at AllenCharles Burton.[18]  Sergeant McDevitt has confirmed

---

[16]    Based upon the chronology offered by Mr. Christian, the raid would have taken place at some time between 4:15-4:50 p.m.

[17]    The other woman and child were not known to the Barber Shop's employees or its other patrons, and have not been identified since the time of the events in question.  At any rate, they are not parties to this case.

[18]    The police officers have generally conceded that their guns were drawn when they entered, but they indicate that they held them in "ready" position, pointed downwards.

that his gun was pointed at Mr. Christian and AllenCharles Burton, each of whom was holding a pool cue in his hand when police entered.[19]  Sergeant Orr, the raid's supervising officer, entered the Shop after the entry party had secured the premises.

The Plaintiffs report that the officers continued to brandish their weapons as they issued orders to the Barber Shop's occupants.  Sergeant Orr and Officer Scanlan approached Mr. Collins and ordered him to stop cutting DeAndray Covert's hair.  Mr. Collins says that they pushed him to the floor, and that Officer Scanlan threatened several times to "blow [his] brains out."  One of the officers told DeAndray Covert to get out of the barber chair and to go look out  the window. Arnette Covert says that she was trying to keep her eyes on her two sons, but an officer ordered her to "get the f[- - -] on the ground," and pressed the barrel of his gun to her right temple.  This allegedly was both audible and visible to her young children.

Mr. Christian, in the rear of the Shop, saw a male officer point a gun towards him and heard the officer command him to "get the f[- - -] down."  Mr. Christian then dropped his pool cue and lay on the floor.  AllenCharles Burton also dropped his cue, and he and Mr. Gilliam fell to the ground near Mr. Christian.  Mr. Gilliam quickly recognized Officer Christopher Eiserman, who had once arrested him for possession of marijuana, and also recognized Sergeant Orr and Officer Scanlan, who remained in the front of the Shop.  Both Officer Eiserman and Sergeant McDevitt walked to the rear of the Shop.

Almost all of the Plaintiffs claim to have heard officers use derogatory racial language

---

[19]     Sergeant McDevitt identified the cues as potential weapons, although Officer Scanlan noted that the cues were never wielded or used in any threatening manner.  The police also identified the presence of barber shop tools – scissors and razors, in particular – as posing a possible threat to their safety, although none of these was wielded threateningly, either.

during the early minutes of the raid, combined in at least one instance with an implied threat of violence. Mr. Gilliam claims that when the male officers first entered the Shop, "all you heard was [them] yelling ... n[- - - -]r this, n[- - - -]r that, get on the ground," and that officers continued to use this language repeatedly. (By way of example, Mr. Gilliam identifies Officer Scanlan as having "chuckled" while saying, "party's over, n[- - - -]rs"). AllenCharles Burton says that an officer yelled, "all you n[- - - -]rs get on the ground." Arnette and DeAndray Covert have both said that some officers in the front of the Shop used racial slurs. Mr. Collins asserts that Officer Scanlan informed him – with his gun pointed at Mr. Collins' head – that "this n[- - - -]r barber shop has come to an end." Each of the Officer Defendants has denied that he used, or indeed heard any of the other officers use, derogatory racial language.[20]

When all the adults in the Barber Shop and AllenCharles Burton were on the floor, Officer Scanlan asked Mr. Collins where he could find Mr. Collins' nephew, a man named Darren "Dee" Brown, who had once owned or operated the Shop. Officer Eiserman asked Mr. Gilliam, who is also related to Mr. Brown, the same question. Mr. Collins told Officer Scanlan that Mr. Brown no longer worked in the Shop. Mr. Gilliam indicated to Officer Eiserman that Mr. Brown had left the Shop approximately two years earlier.

Officer Scanlan handcuffed Mr. Collins. In the back of the Barber Shop, Officer Eiserman had handcuffed Messrs. Christian and Gilliam and AllenCharles Burton. Several Plaintiffs have indicated that Sergeant McDevitt pointed his gun at each of them while Officer

---

[20]    Officer Buckland has indicated that the only people using the "n-word" were the two men in the back of the Barber Shop – presumably Messrs. Christian and Gilliam. According to Mr. Christian, Mr. Gilliam only used this word during an exchange with one of the officers, in which Mr. Gilliam objected to the use of the word, and the officer responded: "you're going to be whatever I say you're going to be, and you're a n[----]r to me."

Eiserman was administering the handcuffs. AllenCharles Burton – who suffers from asthma, and had trouble breathing throughout the raid – says that an unidentified officer pressed a gun to the back of his head. Mr. Gilliam says that a gun was pressed to his head as well.[21] Mr. Collins says that after the police had finished securing the men in the Shop, they "mangled" it in conducting a search.[22] Mr. Collins also says that he was kicked by officers while they searched the Shop, but neither he nor anyone else in the Shop suffered any serious physical injury.[23]

The police searched not only the Barber Shop, but also the adult Plaintiffs themselves, along with AllenCharles Burton. Officer McBride searched Mrs. Covert's handbag. One of the male officers pulled Mr. Collins to his feet, and Sergeant Orr and Officer Scanlan pulled off his shoes and pulled down his pants, leaving him standing in a pair of sweat shorts. The two female patrons in the Shop saw him in this condition. Officer Scanlan found 0.85 grams of marijuana in Mr. Collins' shorts,[24] and also seized $243 in cash from his pockets – which Mr. Collins has said was legitimate proceeds from cutting hair.

Messrs. Christian and Gilliam and AllenCharles Burton were searched by the police

---

[21]    Officer Eiserman has said, and none of the Plaintiffs have contradicted, that he holstered his gun after it became clear that the Plaintiffs had been subdued and secured.

[22]    According to Mr. Gilliam, the officers broke a mirror, the pool table and a machine that changes bills into quarters, and also "put a hole in one of the walls" and knocked down ceiling tiles.

[23]    In the police version of events, a canine search of the Barber Shop was conducted after all of the people in the Shop had been released or removed.

[24]    By way of informational reference, several states that have decriminalized the possession of small amounts of marijuana have set one ounce – or 28.35 grams – as the threshold for criminal prosecution. *See, e.g., Commonwealth v. Mathis*, 922 N.E.2d 816, 817 fn. 4 (Mass. App. 2010); *State v. Smalley*, 225 P.3d 844, 846 (Ore. App. 2010). Pennsylvania is not among these states.

officers in the back area of the Barber Shop.  Mr. Gilliam asserts that after Mr. Christian jerked

in response to having been inadvertently kicked in the head by Mr. Gilliam, one of these officers

said to Mr. Christian: "move again, you goin' die."  Mr. Christian says he could feel this officer's

gun pressed against his head, and that the officer warned him: "if you move again, I'm going to

blow your head off."  Neither Mr. Gilliam nor Mr. Christian could see then, or later identify, the

officer who had allegedly threatened Mr. Christian.  It appears likely that Sergeant McDevitt and

Officers Eiserman and Buckland were all in the back area of the Shop at this point in time, but

Officer Buckland (who is not a party in this case) has said that he was not involved in searching,

because he was carrying a shotgun in both hands, and could neither holster it nor set it down.

Mr. Gilliam says that Officer Eiserman patted and then placed his hands inside the

pockets of his pants – and after finding no contraband, either broke or unbuckled his belt and

unzipped his fly, allowing Mr. Gilliam's pants to fall to his ankles.  Officer Eiserman says that

during the pat-down, he felt a "bulge" which he believed to be a bag of marijuana, and that it was

on this basis that he took off Mr. Gilliam's pants.  Officer Eiserman then searched Mr. Gilliam,

recovered a small amount of marijuana from the pocket of sweat shorts that Mr. Gilliam was

wearing under his pants.  Another officer pulled Mr. Christian to his feet and then searched him;

Mr. Christian cannot identify this officer, but believes it was the same man who had held a gun to

his head and threatened his life.  The officer found $140 in cash in Mr. Christian's wallet, but no

contraband.  The only drugs in the Shop were the small amounts of marijuana that were seized

from Messrs. Collins and Gilliam as described above.

After completing the search, officers brought Messrs. Collins, Gilliam and Christian

outside the Shop, and pushed them into a sitting position on the curb.[25]  Messrs. Collins and

Gilliam, whose pants had been pulled down during the search, remained in their shorts.  The

weather was seasonably cold, and none of the three men wore coats or shoes.  They sat on the

curb for approximately 10 or 15 minutes before the police drove them to the Sharon Hill Police

Station.  The decision to transport the three men to the Station apparently was made by Sergeant

Orr in his capacity as supervisor.  Officer Scanlan has indicated that the taking of the three men

into custody was not meant to constitute an arrest; instead, the purpose was to bring them to a

warmer and more private location where the police could conduct "further investigation."

At the Station, the police placed the three men in holding cells.  According to Messrs.

Collins and Christian, they each waited in their cells for approximately 30 minutes, at which

point they were removed, *seriatim*, and were stripped naked for a visual cavity search.[26]  They

both identify Officer Scanlan as the officer who conducted these searches.  Each man was able to

see the search of the other, and Mr. Christian has said that he could also see Officer Scanlan's

search of Mr. Collins on a video monitor.  Both allege that after their searches were over, they

were returned to their cells, but were not allowed to put on any clothing other than underwear.

After what he estimates to have been 90 minutes of waiting in a cell, Mr. Christian was

released.[27]  Like Officer Scanlan, Sergeant Orr asserts that Mr. Christian was never arrested, but

---

[25]     Officer Scanlan says that he was the officer who escorted the three men outside the Barber Shop.  By this time, AllenCharles Burton had been released to his mother.  Sergeant McDevitt recommended that he "find another barber shop."

[26]     Mr. Gilliam says that he was told to strip naked, and then told to "pull [his] pants down and bend over and cough."  Mr. Christian says that he was told to spread his buttocks.

[27]     Mr. Christian has said that he was released between 6:30 and 7:00 p.m.  Sergeant Orr says that Mr. Christian was released within two hours after the raid.

was simply transported to the Station for "further investigation" – and was then allowed to leave when this investigation was complete. The police did not find contraband on Mr. Christian when they searched him in the Barber Shop or in the Station.

Mr. Gilliam, who had been held in a juvenile room, was transferred into Mr. Christian's cell after Mr. Christian was released. Officer Scanlan then searched Mr. Gilliam in the same fashion that he had searched Messrs. Collins and Christian. Mr. Gilliam stood naked outside his cell during the search, in view of Mr. Collins. After the search, Mr. Gilliam was required to remain in his underwear.

According to Officer Buckland, Sharon Hill had (on December 16, 2005) a policy of conducting strip searches, including a visual body cavity check, of anyone arrested for a drug crime. According to Sergeant Orr, anyone held at the Police Station was strip searched as a matter of course.[28] Officer Buckland and Sergeant Orr agree that a camera generally recorded these searches, and Sergeant Orr has indicated that this camera feeds to a monitor in the Station's squad room – *i.e.*, the room where officers assemble for assignments or briefing – which police officers of both genders can enter freely. Officer McBride has acknowledged that she could see the squad room monitor while Messrs. Collins, Christian and Gilliam were being strip searched, but asserts that she did not watch the searches. Mr. Collins' deposition testimony suggests that a monitor showing searches was also visible from the Station's holding cells. A written policy of the Sharon Hill Police Department indicated that strip searches should be videotaped wherever possible, but there is no video recording of these Plaintiffs' searches in the record.[29]

---

[28]    Sergeant Orr denies that a visual cavity search was included.

[29]    Any videos that may have been made of these Plaintiffs seem to have evanesced.

Messrs. Collins and Gilliam were detained in the Sharon Hill Police Station overnight, and were formally arrested the next morning, December 17, 2005, for possession of marijuana.[30] The case against Messrs. Collins and Gilliam was ultimately dropped after a Pennsylvania state court suppressed the marijuana that the officers had discovered on their person during the raid.

Plaintiffs filed this lawsuit in Pennsylvania state court on May 1, 2008, and the Defendants removed the case to federal court on May 22, 2008.[31] Each of the first seven counts of the Plaintiffs' Complaint asserts a "civil rights" claim by one of the Plaintiffs against all four of the Officer Defendants. These seven counts set forth the basis for the claims brought by each of the Plaintiffs, but do not differentiate between the actions of the Officer Defendants – so that the text of Count I, for example, which describes the bases for Mr. Collins' § 1983 claim against all four of the Officer Defendants, does not indicate whether Mr. Collins is suing one or all of the Officers for using false information to obtain the warrant. Reading the Complaint in conjunction with the record, however, it is plain enough which precise claims appear to lie against each of the four Officer Defendants.

Count I of the Complaint claims that all four of the Officer Defendants violated Mr. Collins' civil rights in obtaining and in executing the warrant to search the Barber Shop, and in

---

[30] Mr. Gilliam has said that before he and Mr. Collins were transferred for arraignment, Officer Scanlan apologized to Mr. Gilliam, and also to his aunt and cousin (who were visiting him at the Station), saying that the raid was the result of a "misunderstanding," and suggesting that the police were really just interested in finding "Dee" Brown.

[31] Since the case was removed, three defendants and various claims have been dismissed. All state law claims against Darby, Folcroft and Sharon Hill were dismissed on November 10, 2008 (Docket. No. 12); *Monell* claims against Darby and Folcroft and all claims against Officer Brian Patterson of Darby were dismissed on August 10, 2009 (Docket No. 20); and all remaining state law claims were dismissed against all of the remaining Defendants on September 9, 2009 (Docket No. 23).

effecting his (allegedly) false arrest; Count II presents the same set of allegations on behalf of Mr. Gilliam; and Count III presents the same set of allegations on behalf of Mr. Christian. Count IV asserts that each of the Officer Defendants violated AllenCharles Burton's rights in obtaining and in executing the warrant to search the Shop; and Counts V-VII present the same allegations on behalf of Mrs. Covert and her two sons, Devin and DeAndray. Finally, Count VIII presents a *Monell* claim against Sharon Hill on behalf of all of the Plaintiffs.

Officer Eiserman filed the first Motion for Summary Judgment (Docket No. 16), and similar Motions were later filed by Sergeant McDevitt (Docket No. 17) and then Sergeant Orr, Officer Scanlan and Sharon Hill (Docket No. 18). These Motions would dispose of all of the claims against each Defendant. The Plaintiffs have never filed a formal memorandum of law opposing these Motions. Their counsel did, however, participate in oral argument before the Court, and ultimately filed a document that was intended to buttress the Plaintiffs' arguments against summary judgment (Docket No. 35). This document is reiterative in many places and skeletal in others, but it does contain references to the record and some legal argument.[32]

---

[32] Under these circumstances, justice does not allow the Plaintiffs' substantive rights to be prejudiced by the arguable shortcomings of their advocate's written submission.

The Court will note, however, that tardy, incomplete and disorganized briefing impedes the resolution of a summary judgment motion. "It consumes an enormous amount of Court time and resources to try to learn what the facts truly are when matters are poorly briefed or poorly presented." *Selby v. Arms*, 1996 U.S. Dist. LEXIS 3513, *17-18 (S.D.N.Y. March 15, 1996). Courts must naturally assimilate sundry and conflicting evidence in identifying genuine issues of material fact, but "judges are not like pigs, hunting for truffles in briefs," *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991), and Rule 56 "does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). Suffice it to say that arguments in this case have been presented in such a manner as has required at the least a generous amount of the Court's attention and efforts.

Upon the motion of a party, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Summary judgment may be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  *Miller*, 843 F.2d at 143.   An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Id.*

## SECTION 1983 STANDARDS

The Court begins its analysis by surveying two legal standards that are relevant to Plaintiffs' claims against each of the Officer Defendants, and the standard that governs *Monell* claims against a local government such as Sharon Hill.

## I.      Section 1983

The federal civil rights statute, 42 U.S.C. § 1983, authorizes a cause of action for those who challenge a state's "deprivation of any rights ... secured by the Constitution."  Section 1983 was enacted during Reconstruction, and was designed "to interpose the federal courts between the states and the people, as guardians of the people's federal rights."  *Mitchum v. Foster*, 407

U.S. 225, 242 (1972). It is not itself a source of substantive rights, "but a method for vindicating federal rights elsewhere conferred ... ." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979).

In order to make out a *prima facie* case against an individual under § 1983, a plaintiff must show (1) that this person deprived him or her of a federal right; and (2) that in doing so, this person was acting under color of state or territorial law. *Edwards v. City of Philadelphia*, 860 F.2d 568, 573 (3d Cir. 1988) (*citing Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).[33]

## II.     Qualified Immunity

Even if a plaintiff has made out a *prima facie* case under § 1983 by showing that a police officer deprived him or her of a federal right while acting under color of state law, the officer may be entitled to qualified immunity.[34] Under the qualified immunity doctrine, law enforcement officers acting within their professional capacity are immune from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"The relevant, dispositive inquiry in determining whether a right is clearly established is

---

[33]     The standard for making out a § 1983 claim against a local government is different, and is described in Subsection III, *infra*.

[34]     The first step in a qualified immunity analysis is determining "whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Conn v. Gabbert*, 526 U.S. 286 (1999). If there has been no violation, then further analysis is unnecessary. The plaintiff bears the burden of proof on the question of whether a constitutional violation occurred. *Henry v. Purnell*, 501 F.3d 374, 377-78 (4th Cir. 2007) (*citing Bryant v. Muth*, 994 F.2d 1082, 1086 (4th Cir. 1993)). In this case, it is appropriate to discuss the qualified immunity standard before discussing the relevant standards for the particular violations that have been alleged.

whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). This inquiry "must be undertaken in light of the specific context of the case." *Id.* at 201. "Therefore, to decide whether a right was clearly established, a court must consider the state of the existing law at the time of the alleged violation and the circumstances confronting the officer to determine whether a reasonable state actor could have believed his conduct was lawful." *Kelly v. Borough of Carlisle*, 2010 U.S. App. LEXIS 20430 at *8-9 (3d Cir., October 4, 2010) (*citing Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Berg v. County of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000); *Paff v. Kaltenbach*, 204 F.3d 425, 431 (3d Cir. 2000)).

To be established clearly, however, there is no need that "the very action in question [have] previously been held unlawful." *Safford Unified Sch. Dist. #1 v. Redding*, 129 S. Ct. 2633, 2643 (2009) (*quoting Wilson*, 526 U.S. at 615). The unconstitutionality of outrageous conduct will be obvious, with the result that "[t]he easiest cases don't even arise." *Id.* (*quoting K. H. v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990) (Posner, J.)). "But even as to action less than an outrage, 'officials can still be on notice that their conduct violates established law ... in novel factual circumstances.'" *Id.* (*quoting Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Qualified immunity is an affirmative defense, and an officer asserting it therefore bears the burden of proving its applicability to his or her case. *Thomas v. Independence Twp.*, 463 F.3d 285, 292 (3d Cir. 2006).

### III.    *Monell* Liability

*Monell* made clear that a "local government may not be sued under § 1983 for an injury

[that has been] inflicted solely by its employees or agents." *Brown v. Pittsburgh*, 586 F.3d 263, 292 (3d Cir. 2009) (*quoting Monell*, 436 U.S. at 694). In other words, a plaintiff cannot rely upon a theory of *respondeat superior* to impose § 1983 liability upon a municipality.

"Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* Thus, the analysis of *Monell* claims focuses on whether there is evidence that the defendant municipality made a "deliberate" or "conscious" decision to adopt a certain policy or custom and that this policy or custom was actually the "moving force" behind any constitutional violations that may have been perpetrated by its employees. *Canton v. Harris*, 489 U.S. 378, 389 (1989) (*citing County v. Dodson*, 454 U.S. 312, 326 (1981); *Pembaur v. Cincinnati*, 475 U.S. 469, 483-484 (1986)).

DISCUSSION

Although each of the Plaintiffs has accused each of the Officer Defendants of violating each of their respective Fourth and Fourteenth Amendment rights, the bases of various Plaintiffs' claims against the various Officer Defendants differ. The Court will discuss, in turn, each of the four species of claims that one or more of the Plaintiffs has alleged against one or more of the Officer Defendants, and will then turn to the Plaintiffs' *Monell* claim.

I.      **Procurement of the Search Warrant**

Each of the Plaintiffs alleges that Officer Scanlan "acted without probable cause and relied upon purposefully false information" in obtaining a search warrant for the Barber Shop,

and that in doing so he violated their clearly-established Fourth Amendment rights. They also allege that Sergeant Orr is responsible for falsehoods in Officer Scanlan's affidavit of probable cause in his capacity as Officer Scanlan's superior. These Fourth Amendment claims appear in Counts I-VII of the Complaint.[35] For the reasons set forth below, neither Officer Scanlan nor Sergeant Orr is entitled to summary judgment on this issue.

### A. *Legal Standard*

In order to establish that a police officer violated the Fourth Amendment in procuring an arrest or search warrant, a plaintiff must demonstrate by a preponderance of the evidence that (1) the officer made false statements or omissions in the affidavit either deliberately or with reckless disregard for the truth; and (2) those misstatements or omissions were material to the judicial officer's finding of probable cause. *Sherwood v. Mulvihill,* 113 F.3d 396, 399 (3d Cir. 1997) (*citing Franks v. Delaware*, 438 U.S. 154, 171-72 (1978) (applying the exclusionary rule)).[36]

A plaintiff alleging a misstatement by an affiant officer must cite evidence that the officer acted "with a high degree of awareness of [a statement's] probable falsity" – in other words, that the officer, "when viewing all the evidence, ... entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000). An officer's omission, by contrast, is considered to

---

[35]     As the Court has noted, Counts I-VII do not differentiate between the four Officer Defendants. However, the record provides no evidence that either Sergeant McDevitt or Officer Eiserman might be culpable for false information in Officer Scanlan's affidavit.

[36]     In this case, there is no question that the Officer Defendants raided the Barber Shop pursuant to a search warrant signed by a magistrate. However, the Plaintiffs challenge the warrant's validity on the ground that the affidavit of probable cause in support of the warrant was "fatally defective" as a result of its reliance upon false statements by Officer Scanlan.

have been made with reckless disregard where the officer withheld "a fact in his ken that any reasonable person would have known that this was the kind of thing the judge would wish to know." *Id.* (*quoting United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).

In evaluating the materiality of a misstatement or omission, courts must "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." *Id.* at 789. "If the 'corrected' warrant affidavit [still] establishes probable cause, then no civil liability lies against the officer" in connection with his procurement of the warrant. *Miller v. Prince George's County*, 475 F.3d 621, 628 (4th Cir. 2007). Probable cause exists when, in consideration of the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

### B. *Officer Scanlan*

The Court must first determine whether the controlled buy that is alleged to have taken place on December 16 was necessary to the magistrate's finding of probable cause. In this case, Officer Scanlan's affidavit in support of his warrant application describes two controlled buys in the Barber Shop: the first on May 11, 2005, six months prior to the raid; and a second within 48 hours prior to the issuance of the warrant.[37] Excising the second of these from the affidavit, the magistrate would not have been entitled to issue a warrant to search the Barber Shop: the May 11 buy involved a small amount of drugs – "three small pink glassine bags" of crack cocaine – and was simply too far removed from the date of the warrant application to provide probable cause to

---

[37] As a general matter, such controlled buys may be used to establish probable cause. *See, e.g., United States v. Rauser*, 378 Fed. Appx. 229, 234 (3d Cir. 2010) (*citing United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006)).

believe that the Shop then housed a drug operation. *See, e.g., Owens v. United States,* 387 F.3d 607 (7th Cir. 2004) (Posner, J.) (no probable cause where the search warrant had been based upon a single controlled buy of an uncertain – and possibly small – amount of drugs three months prior to issuance, because the controlled buy provided "no basis for thinking either that the premises were a crack house or that the money received in the sale would still be on the premises").

Assuming, *arguendo*, that Officer Scanlan simply fabricated the December 16 buy, as Plaintiffs contend, then his sworn statement regarding the buy was intentionally false. Officer Scanlan could not be immune for any such fabrication, since "it has long been clearly established that the Fourth Amendment's warrant requirement is violated when 'a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in a warrant affidavit if the false statement is necessary for a finding of probable cause.'" *Aponte Matos v. Toledo-Davila,* 135 F.3d 182, 187 (1st Cir. 1998) (*quoting Franks,* 438 U.S. at 155-56). And the fact that Officer Scanlan's alleged deliberate misstatement would have been material follows directly from the necessity of the second buy to the finding of probable cause.

The final question is whether there is sufficient evidence in the record to give rise to a genuine dispute as to the truth of Officer Scanlan's statement in the affidavit. The Court finds that there is. Although the only evidence indicating that the December 16 buy might have been contrived is circumstantial, it is sufficient to defeat summary judgment.[38] In the absence of any evidence for the second buy beyond the testimony of three Defendants, and in light of ambiguous documentary evidence that gives rise to a genuine factual dispute as to whether the buy truly took

---

[38] Circumstantial as well as direct evidence may give rise to a genuine issue of material fact. *See Eichorn v. AT&T Corp.*, 484 F.3d 644, 648 (3d Cir. 2007).

place, a reasonable finder of fact could determine that the December 16 buy was concocted, and could thus find Officer Scanlan liable under § 1983.[39]

The Court does not base this conclusion upon its own definitive reading or interpretation of the handwriting on the affidavit of probable cause or the search warrant, nor does it assume that any ambiguities that do exist are necessarily evidence of wrongdoing. However, given that the Court must view the evidence in the light most favorable to the Plaintiffs,[40] it cannot find that record would not permit a jury to reasonably question the warrant's validity.

**B.      *Sergeant Orr***

Sergeant Orr has also stated that he was present for the second controlled buy at the Barber Shop, and has said that he "probably" reviewed Officer Scanlan's affidavit of probable cause prior to its submission in his capacity as Officer Scanlan's superior. As a result, Sergeant Orr is directly responsible for any material falsehoods that may appear in the affidavit – at least insofar as such falsehoods relate to facts that were within his ken (*e.g.*, whether the second buy truly happened at the general time and place that Officer Scanlan that indicated). There is no

---

[39]      It should be emphasized that the possibility of inconsistencies as to dates and times is not necessarily sufficient to defeat summary judgment in any case where a plaintiff is alleging that a warrant was improperly procured. Police officers cannot be subjected to a game of legal "gotcha" based on immaterial typographical or chronological errors.

      The possible inconsistencies in this case are relevant because taken in context, they help create a genuine issue of material fact as to whether the second controlled buy was a fabrication. If Officer Scanlan really did date his affidavit the day before he says that the second buy took place (i.e., on December 15), or sign and date his warrant application two months prior to the issuance of the warrant, then it is at least possible that the affidavit was intentionally false, and that the search warrant was issued without probable cause.

[40]      Summary judgment is appropriate "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, a verdict in favor of the nonmovant cannot be supported by legally sufficient evidence." *Toledo Mack Sales and Serv. v. Mack Trucks*, 530 F.3d 204, 209 (3d Cir. 2008).

basis for excluding a supervising officer from § 1983 liability where he claims to have joined the affiant in witnessing relevant events, and likely substantially reviewed the affidavit prior to its submission to a magistrate.[41]

C.    *Standing*

Standing to bring a § 1983 action based on a defective search warrant is limited to individuals who had a reasonable expectation of privacy. *See Grospitz v. Abbott*, 2005 U.S. Dist. LEXIS 46978 at *38 (W.D. Mo. 2005). There is generally no reasonable expectation of privacy in physical areas of a business where the public is routinely invited to enter and to transact business. *United States v. Watson*, 244 Fed. Appx. 484, 488 (3d Cir. 2007) (addressing this issue in the suppression context). Because there is no dispute that the Barber Shop was open for business on the afternoon of December 16, 2005, the police were at least entitled to examine those areas of the Shop that were also open to customers. *Cf. Marshall v. Barlow's, Inc.*, 436 U.S. 307, 315 (1978).

The record suggests, however, that the Officer Defendants extended their search well beyond the public areas of the Barber Shop. As is discussed in more detail in Section II-B, *infra*, comprehensive searches of the adult Plaintiffs and AllenCharles Burton may have been unlawful

---

[41]    Supervisor liability under § 1983 requires a showing that the supervising officer participated in violating the plaintiffs' rights, or that he directed others to violate them, or that he, as the person in charge of a raid, had knowledge of and acquiesced in a subordinate's violations. *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). As to this issue, there is at least some evidence that Sergeant Orr knew of and acquiesced in any intentional material falsehoods that may have appeared in the affidavit.

even if the warrant was perfectly valid.[42]  And as the Court will explain in Section II-A, *infra*, the record allows each Plaintiff to proceed with an excessive force claim.  To the extent that standing is at issue, the relevant question is whether each of the Plaintiffs suffered a cognizable injury as a result of the warrant's issuance.  And given that the warrant provided the basis for the search, the Court finds that the Plaintiffs' claims regarding illegal searches and excessive force in the execution of the warrant constitute an injury sufficient to give each of the Plaintiffs standing to sue the two Officer Defendants who were involved in its procurement.[43]

## II.        Execution of the Search Warrant

Each of the Plaintiffs has alleged that each of the Officer Defendants violated his or her Fourth Amendment rights by using constitutionally excessive force in executing the warrant to search the Barber Shop.  Messrs. Collins and Gilliam also assert that the four Officer Defendants violated their Fourth Amendment rights by seizing marijuana from the pockets of their sweat shorts "in violation of the 'plain feel' doctrine."  These claims are presented in Counts I-VII of the Complaint.  For the reasons set forth below, none of the four Officer Defendants are entitled

---

[42]        This is true *a fortiori* if the warrant was not, because this would undermine the justification that Sergeant Orr and Officer Scanlan have adduced to justify their conduct  – *viz.*, that officers executing a warrant are entitled to do things like aim their guns and use aggressive language to secure the premises and ensure their own safety.

Of course, to the extent that any of the Officer Defendants – including Sergeant Orr and Officer Scanlan – believed the warrant to be valid, they were entitled to rely upon it in good faith in executing the search.  *See Leon*, 468 U.S. 897.

[43]        None of the Officer Defendants' allegedly illegal conduct during the raid falls outside the realm of conduct that would have been reasonably foreseeable to an officer involved in obtaining a warrant to search a location believed to be the base of a drug dealing operation.  *Cf. Zippertubing v. Teleflex*, 757 F.2d 1401, 1412-13 (3d Cir. 1985) (the measure of damages in tort cases includes only those "reasonably forseeable" to the tortfeasor).

to summary judgment with regard to either the execution of the warrant in general or the searches of Messrs. Collins and Gilliam in particular.

    **A.**    ***Legal Standard for Excessive Force***

The Supreme Court has held that officers executing a search warrant may lawfully restrain persons present at the searched premises. *See Michigan v. Summers*, 452 U.S. 692, 705 (1981) ("a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted") (footnotes omitted). The reason for this rule is that the execution of a warrant "may give rise to sudden violence or frantic efforts to conceal or destroy evidence." *Id.* at 702. The risk of harm to officers and occupants alike can be "minimized if the officers routinely exercise unquestioned command of the situation." Id. at 703. Thus, courts have found that officers sometimes may be entitled to handcuff occupants of a residence while searching for drugs and weapons. *See Torres v. United States*, 200 F.3d 179, 186 (3d Cir. 1999) (*citing U.S. v. Fountain*, 2 F.3d 656 (6th Cir. 1993); *Van Brackle v. Parole Bd.*, 1996 U.S. Dist. LEXIS 13998 (E.D. Pa. Sept. 26, 1996)).

However, officers lawfully executing a warrant are still bound by certain prudential constraints, and their behavior must be justified by the circumstances. *Torres*, 200 F.3d at 186 (*citing Baker v. Monroe Township*, 50 F.3d 1186 (3d Cir. 1995)); *see also Summers*, 452 U.S. at 705 n.21 (in cases that involve "special circumstances or possibly a prolonged detention," use of restraint in executing a search warrant may exceed officers' authority). Therefore, in evaluating whether officers' actions were constitutionally proportional, courts must examine the particular facts of the case, and weigh the governmental interest in preventing violence and the destruction of evidence against any intrusions on the liberty of the plaintiffs. *See Muehler v. Mena*, 544 U.S.

93, 99 (2005) (evaluating whether governmental interests "outweighed" intrusions).  The test to be applied in evaluating an excessive force claim is one of objective reasonableness, *Graham v. Connor*, 490 U.S. 386 (1989), and, sensibly, its application must allow for the fact that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Groman v. Township of Manalapan*, 47 F.3d 628, 696-97 (3d Cir. 1995).

In  *Sharrar v. Felsing*, 128 F.3d 810 (3d Cir. 1996), the Court of Appeals set forth a common sense list of specific factors for determining the objective reasonability of an officer's actions in effecting an arrest or executing a warrant.  A reasonable officer must consider:

> the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others ... whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight ... [whether] the physical force applied was of such an extent as to lead to injury ... the possibility that the persons [who are being subjected] to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

128 F.3d at 821-822.[44]

"The reasonableness of the use of force is normally an issue for the jury."  *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004).  Nonetheless, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the

---

[44]      This list of factors follows the Supreme Court's injunction that the objective reasonability test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.

plaintiff, that [an] officer's use of force was objectively reasonable under the circumstances."

*Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (citations omitted).

      **B.**     ***Excessive Force Analysis***

      Application of the *Sharrar* analysis to this case yields the conclusion that none of the Officer Defendants is entitled to summary judgment with regard to the execution of the search warrant. In *Sharrar*, the Court held that "extreme methods" employed by officers effecting an arrest – which included "requiring plaintiffs to lie face down in the dirt with guns to their heads" and the use of "vulgar threats" – were not constitutionally excessive. In that case, however: (1) the police were responding to an alleged incident of domestic violence in which the victim had been seriously bloodied by her attackers; (2) the officers had apprehended the suspects with the prior goal of arresting them (and not merely in the course of effecting a search warrant); and (3) the officers had reason to believe that at least one suspect was carrying a gun. Id. at 814-17.[45]

      In this case, on the other hand, the Officer Defendants are alleged to have entered the Barber Shop with their guns drawn during business hours – and indeed not long after the close of school, when they might easily have anticipated that young children would be present.[46] Sergeant Orr was the supervising officer in charge of the raid,[47] and circumstantial evidence suggests that

---

      [45]      In *Sharrar,* the Court distinguished a prior case holding that dismissal was not appropriate where an officer pointed his gun at, and threatened to kill, a 9-year old boy who was not under arrest and posed no clear threat. *McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992).

      [46]      When asked why the raid was conducted at this time, Officer Scanlan said that he believed it had taken place then for a reason, but that he did not know what that reason was.

      [47]      As noted at fn. 41, *supra*, supervisor liability under § 1983 may be based on the fact that a supervising officer participated in violating the plaintiffs' rights; or that directed others to violate them; or that he knew of and acquiesced in a subordinate's violations.

he may be the officer who put a gun to Mrs. Covert's temple while ordering Officer McBride to search her. Officer Scanlan is alleged to have aimed his gun at Mr. Collins' head and threatened to "blow [his] brains out." In the back of the Barber Shop, Sergeant McDevitt is alleged to have aimed his gun at Messrs. Christian and Gilliam and young AllenCharles Burton as Officer Eiserman handcuffed them. One of the officers in the back area of the Shop – who none of the Plaintiffs could identify definitively, presumably (or at least arguably) due to the fact that they were lying face down on the floor – allegedly threatened to kill Mr. Christian while pressing a gun against his head. Mrs. Covert's two small boys, who were present throughout the raid, saw an officer put a gun to their mother's head, and have said that they were terrified by the police officers' crude language and threats.[48] And it is not clear from the record that the Officer Defendants had any reasonable suspicion that AllenCharles Burton or any of the adults in the Shop was armed, calling into question whether they were even entitled to conduct an aggressive pat-down search for weapons – let alone a thorough examination of pockets, wallets and bags, which would have required probable cause.[49]

The Officer Defendants did not raid the Barber Shop in response to a suspected crime of violence, but rather on the ground that it had been the site of two small drug purchases – one of which had occurred over six months earlier. Although there was, of course, some possibility that someone in the Shop might have a gun or would physically resist the search, there is no evidence in the record that the police had any particular reason to suspect that a gun would be present, and

---

[48]      Several of the police officers remember the children crying.

[49]      See discussion in Section II-B, *infra*.

there is also no evidence that any Plaintiff resisted or threatened the officers.[50]  In addition, while there were nine people in the Shop when the police entered, four were under 14 years of age, and two were mothers physically accompanying their children.  Only three were adult men – and each of the three was standing near a child when the raid began.

As our Court of Appeals has observed, even "Rambo-type behavior associated with police in overdramatized B movies or TV shows" is not necessarily excessive where the police are pursuing with intent to arrest three grown men suspected of a violent felony, one of whom is reasonably suspected to have a gun.  *Sharrar*, 128 F.3d at 822.  But this does not indicate that the same sort of behavior will pass constitutional muster when employed in searching an open barber shop on a Friday afternoon at the start of the December holiday season – especially where the police officers conducting the search lack any specific basis on which to suspect that the shop's inhabitants will be armed or dangerous.

The Court recognizes that officers executing search warrants cannot be required to comply with "Marquis of Queensberry Rules of fair play."  *Id.*  The Court further understands that officers may use verbal "shock and awe" tactics, including harsh words and threats, as a legitimate means of deterring resistance.  *Evans v. Stephens*, 407 F.3d 1272 at fn. 12 (11th Cir. 2005).  But our Constitution requires that even warranted searches be "reasonable" under their circumstances, and the record in this case contains evidence which could reasonably give rise to

---

[50]     When asked during his deposition whether there was "any information that there were weapons in the Barber Shop," Sergeant Orr responded: "Not that I'm aware of."
Officers Eiserman and Scanlan were aware that Mr. Gilliam had criminal record, but they also knew that it was for marijuana possession rather than a crime of violence, and that he had been sentenced to probation.  They did not, however, know that Mr. Gilliam would be in the Barber Shop when they entered.  Otherwise, none of the Officer Defendants had any specific knowledge that anyone in the Shop had a criminal background.

the conclusion that the search here was not. As a result, Plaintiffs are entitled to proceed against each of the Officer Defendants on the issue of excessive force in executing the warrant.[51]

## B. *The "Plain Feel" Doctrine*

Messrs. Collins and Gilliam have also alleged that in searching their sweat short pockets without having felt any contraband during an external pat-down, the Officer Defendants violated the "plain feel" doctrine, and therefore performed an illegal search. The two Officer Defendants who are alleged to have physically recovered the marijuana from Messrs. Collins and Gilliam are Officers Eiserman and Scanlan, respectively – but the record contains evidence that Sergeant Orr also participated in the search of the former, and Sergeant McDevitt in the search of the latter.

The "plain feel" doctrine allows an officer to seize contraband discovered during a pat-down search for weapons conducted during an investigatory stop, or *Terry* stop, which requires

---

[51]     None of the Officer Defendants are entitled at this juncture to a ruling of qualified immunity as to this issue because the constitutional right to be free from use of excessive force in execution of a search warrant was, under the facts of this case, clearly established in 2005. *See Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985); *see also* discussion and cases cited at fn. 57, *infra*.

The Court does not base its decision on the alleged use of racially derogatory language by any of the Officer Defendants. (Indeed, only two of the Defendants, Officer Scanlan and Sergeant McDevitt, have been specifically identified as having used the word "n[- - - -]r," although Mr. Gilliam has said that Officer Eiserman ordered him to keep his "black ass on the ground.") Although bias is not relevant to an excessive force analysis, the use of such language by officers executing a warrant can create an atmosphere of frightening and volatile lawlessness. This reenforces the conclusion that it would be precipitous to grant summary judgment as to the issue of excessive force. *See Evans*, 407 F.3d at 1282 (noting that while "words alone [cannot] make the manner of an otherwise properly conducted search unconstitutional under the Fourth Amendment," police officers' use of "terrifying language," including racial epithets, "has an impact on people and counts towards the unreasonableness of the manner of ... searches").

Finally, the Court notes that even if the record did not contain evidence that each of the individual Officer Defendants had used excessive force himself, our Court of Appeals has indicated in that even non-supervisory police officers have a clearly-established obligation to intervene to prevent the use of excessive force by their colleagues. *Garbacik v. Janson*, 111 Fed. Appx. 91 (3d Cir. 2004) (non-published opinion). The record here does not indicate that any of the four Officer Defendants attempted to rein in any of the other officers.

only reasonable suspicion rather than a warrant or probable cause. *See United States v. Yamba*, 506 F.3d 251, 256-257 (3d Cir. 2007) (*citing Terry v. Ohio*, 392 U.S. 1 (1968); *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)). Although a warranted search of a fixed premises can generally extend to any place that might contain evidence specified in the warrant – including into sealed bags or containers[52] – the Supreme Court has held that the logic of investigative stops also applies to searches of individuals who are merely present when a warrant is executed. *See Ybarra v. Ill.*, 444 U.S. 85 (1979) (suppressing drugs found in the pocket of a tavern patron not who was not named in a warrant to search the tavern, and who police initially had no reasonable suspicion was armed and later no probable cause to search).

Thus, even when acting pursuant to a valid warrant to search a premises for drugs, the police cannot conduct a protective pat-down search of a person who is merely present on those premises absent reasonable and particularized suspicion that he or she is armed. *United States v. Hall*, 193 Fed. Appx. 125, 128-129 (3d Cir. 2006) (*applying Ybarra*, 444 U.S. at 92-93); *see also United States v. Campbell*, 843 F.2d 1089, 1093-94 (8th Cir. 1988) ("officers [searching based on reasonable suspicion] must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a 'hunch' or on circumstances which 'describe a very broad category of predominantly innocent travelers'"); *Doe v. Groody*, 361 F.3d 232, 243 (3d Cir.2004) ("a search warrant for a premises does not constitute a license to search everyone inside"). While the only permissible goal of a protective pat-down search based upon reasonable suspicion is to check for weapons, the "plain feel" doctrine was created to allow officers to seize other items that they can

---

[52] *United States v. Hills*, 2009 U.S. Dist. LEXIS 119943 at *13-14 and fn. 8 (E.D.Pa. December 23, 2009).

feel through the suspect's outer clothes, and which are immediately identifiable to the touch as a recognizable form of contraband. *Hall*, 193 Fed. Appx. 125, 130-132.

Sergeant Orr and Officer Scanlan have not identified any particularized basis for reasonable suspicion that would have justified a protective pat-down search of Mr. Collins, if indeed such a pat-down search was ever conducted. Nor have they identified what probable cause they might have had to remove Mr. Collins' pants and search for contraband inside his sweat shorts.[53] In addition, although Officer Eiserman apparently patted down the outer pocket of Mr. Gilliam's pants before removing them, and says that he felt a "bulge" which indicated the presence of a bag of marijuana, he has not identified any basis for reasonable suspicion that Mr. Gilliam was armed.[54] Thus, there are facts in the record that would allow a reasonable jury to conclude that the personal searches of Messrs. Collins and Gilliam were conducted in violation of the Fourth Amendment.[55]

### III. Excessive Force in Arrest

Messrs. Collins, Gilliam and Christian argue that the Officer Defendants used excessive

---

[53] Sergeant Orr and Officer Scanlan emphasize their "training and experience regarding the proximity of guns to narcotics" – a genuine nexus – and Officer Scanlan has said that "where there's drugs, there's usually weapons," but the law is clear that reasonable suspicion must be particular to a suspect, not to a generic situation. (And of course the invocation of this recognized drugs-guns connection inspires the recollection that there is an actual question about the reasonableness of suspecting the presence of drugs in the Barber Shop.)

[54] The fact that Mr. Gilliam had already been subdued and handcuffed when the pat-down search occurred also weakens the permissible rationale for such searches.

[55] As the cases cited in this section indicate, the right to be free from non-routine pat-down searches without reasonable suspicion, and from full-body searches without probable cause, was clearly established in 2005.

force in effecting their arrests. This claim – which is similar to the Plaintiffs' claim challenging the execution of the search warrant – appears in Counts I-III of the Complaint.

### A.  *Legal Standard for Excessive Force*

Given that the use of excessive force in making an arrest "may deprive the victim of a Fourteenth Amendment liberty without due process of law," the use of such force is actionable under § 1983. *Black v. Stephens*, 662 F.2d 181, 188 (3d Cir. 1981). Whether such liberty was actually deprived is the first element of an excessive force claim; and citing facts in the record that would allow the finder of fact to answer this question in the affirmative is therefore part of the plaintiff's burden. *Edwards*, 860 F.2d at 573. Claims alleging that officers used excessive force in effecting an arrest are analyzed under the same rubric that is applied to claims alleging that officers used excessive force in executing a warrant – namely, "whether, under the totality of the circumstances, [an arresting officers'] actions were objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." *Estate of Smith v. Marasco*, 318 F.3d 497, 515 (3d Cir. 2003).[56]

Whether a suspect has been arrested does not turn on the terminology used by, or subjective intent of, officers, nor upon the subjective impressions of the suspect. "Although there are no scientifically precise benchmarks for distinguishing between temporary detentions and *de facto* arrests, the standard mode of inquiry is to assess the totality of the circumstances and ask whether a reasonable person in the suspect's shoes would understand herself [or himself] to be subject to restraints comparable to those associated with an arrest." *Morelli v. Webster*, 552 F.3d 12, 20 (1ˢᵗ Cir. 2009) (*citing Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)).

---

[56]  *See also* cases cited in Section II-A, *supra*.

## B.     *Excessive Force Analysis*

As a threshold matter, it is clear that whether or not the Officer Defendants informed Messrs. Christian, Collins and Gilliam that they were under arrest when they handcuffed them and took them to the Sharon Hill Police Station, this was not a temporary detention for "further investigation" but an arrest.  The distinction between detention and arrest is practical rather than formal, and each of the three men was handcuffed, forced to sit on the curb outside of the Barber Shop, removed in police vehicles to the Sharon Hill Police Station, and then spent at least 90 minutes in a holding cell in the police station.

The *Sharrar* case, 128 F.3d 810, discussed in Section III, actually was decided in the context of an arrest claim, rather than one relating to the execution of a search.  Applying the *Sharrar* factors to the question of whether Officer Defendants used excessive force in arresting Messrs. Christian, Collins and Gilliam, the Court again concludes that the record could allow a reasonable jury to find that excessive force was employed.  As the Court has already observed, the Officer Defendants have not supplied particularized reasons to believe that any of these three men would be armed or dangerous or would resist arrest or flee.  In light of this fact, and viewing the evidence in the light most favorable to the Plaintiffs, the Officer Defendants' alleged conduct could give rise to a claim based on excessive force in arrest.[57]

---

[57]     Among the particularly salient facts alleged are that Officer Scanlan threatened several times to "blow [Mr. Collins'] brains out" while pointing a gun at his head; that Sergeant McDevitt aimed his gun at Messrs. Christian and Gilliam while they were being handcuffed by Officer Eiserman; and that an as-yet unidentified officer in the back of the Barber Shop – where Sergeant McDevitt and Officer Eiserman were located – pressed his gun against the heads of Mr. Christian and Mr. Gilliam and threatened to kill Mr. Christian.  Each of the Officer Defendants was involved in the arrest of at least one of the men (with Sergeant Orr liable as a superior), and the Court also reiterates that our Court of Appeals has indicated that officers have a clearly-established obligation to intervene to stop others from using excessive force.  *See fn.* 51, *supra.*

35

## IV.     False Arrest or Imprisonment

Messrs. Christian, Collins and Gilliam have all asserted that they were falsely arrested or imprisoned by all of the Officer Defendants.  These claims, which are presented in Counts I-III of the Complaint, must be analyzed separately for Mr. Christian and for Messrs. Collins and Gilliam, in light of the differences between the circumstances of their arrests.

### A.     *Legal Standard*

An arrest that is made without probable cause will support a cause of action for false arrest under § 1983.  *See Dowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988).   In the arrest context, "probable cause ... exists when the facts and circumstances within the arresting

---

As to whether the use of guns and threats can constitute excessive force, *see Baker*, 50 F.3d 1186, 1193 (allowing plaintiffs to proceed with an excessive force claims where officers pointed guns at and handcuffed several non-threatening individuals); *Baldwin v. Placer Co.*, 418 F.3d 966, 970 (9th Cir. 2005) (finding excessive force where officer pointed gun at rear of plaintiffs' heads with no evidence that plaintiffs may be violent); *Kerman v. City of New York*, 261 F.3d 229, 239-40 (2d Cir. 2001) (finding that officers' name-calling and threat to "blow [the arrested's] brains out" was "verbal abuse [and] humiliation" which "might well be objectively unreasonable and therefore excessive"); *Robinson v. Solano County*, 278 F.3d 1007, 1015 (9th Cir. 2002) ("brandishing a cocked gun" in front of an individual's face lays "the building blocks for a § 1983 claim" even in the absence of any physical injury); *Jacobs v. City of Chicago*, 215 F.3d 758, 774 (7th Cir. 2000) (noting that "holding [a] gun to a person's head and threatening to pull the trigger is a use of deadly force"); *Marasco*, 318 F.3d at 516-17 (distinguishing *Sharrar* and emphasizing the importance of reasonableness under the particular circumstances of the case – including, most notably, whether the police had reason to believe arrestees were dangerous).

None of the officers are entitled to immunity because the right to be free from excessive force in arrest was, under the facts of this case, clearly established in 2005.  *See Estate of Smith v. Marasco*, 430 F.3d 140 (3d Cir. 2005) (noting that officers who incorrectly apply the *Sharrar* factors are not entitled to qualified immunity, and holding that the district court erred in finding immunity for excessive force based on the storming of plaintiff's house, even where there was evidence that plaintiff owned and fired a gun); *cf. Green v. N.J. State Police,* 246 Fed. Appx. 158 (3d Cir. 2007) (finding that a general right to freedom from excessive force had been clearly established, but that it was not clearly established that an officer was not allowed to use certain non-deadly force – including his hands and pepper spray – to subdue an unruly suspect).

officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995). Further, because "[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction, ... the evidentiary standard for probable cause is significantly lower than the standard which is required for conviction." *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005) (internal quotations and citations omitted).

Although determinations of probable cause are usually the province of the jury, a district court "may conclude that probable cause did exist as a matter of law if the evidence, viewed in the light most favorably to the plaintiff, reasonably would not support a contrary factual finding." *Marasco*, 318 F.3d at 514 (internal citation and quotations omitted).

## B. *Mr. Christian*

Based on the record in this case, none of the Officer Defendants are entitled to summary judgment as to Mr. Christian's false arrest claim.[58] Mr. Christian, a Barber Shop patron, was not found to have any contraband when he was searched by Sergeant McDevitt and Officer Eiserman in the Shop.[59] There is also no evidence that he resisted arrest or otherwise posed any particular threat to the police. Indeed, Sergeant Orr and Officer Scanlan have conceded that his arrest was

---

[58] All of the Officer Defendants were involved in Mr. Christian's arrest. Sergeant Orr was the supervising officer, and could be held directly liable for the arrest. *See* fn. 41, *supra*, for a discussion of supervisor liability under § 1983. Officer Eiserman allegedly searched and handcuffed Mr. Christian while Sergeant McDevitt aimed a gun at him. And Officer Scanlan was involved in the arrest of all three men and conducted the searches at the Police Station.

[59] Mr. Christian was then employed as an environmental health and safety commissioner at a shipyard in Philadelphia, and had no criminal record.

without probable cause, although they disclaim responsibility.  However, the fact that Sergeant

Orr supervised the raid and all of the arrests, and that Officer Scanlan was involved in taking Mr.

Christian into custody and searching him at the Police Station, demonstrates that Mr. Christian is

entitled to proceed against all of the Officer Defendants on the issue of false arrest.[60]

### C. *Messrs. Collins and Gilliam*

The Officer Defendants argue, and Messrs. Collins and Gilliam concede, that there was

marijuana in their sweat short pockets when they were searched.  In Pennsylvania, even a small

amount of marijuana provides probable cause to effect an arrest.[61]  Messrs. Collins and Gilliam

point out that the marijuana was suppressed in their criminal cases, but this fact does not control

and indeed is not relevant to the question of whether the police were justified in arresting them

after finding the drugs.

"The lack of probable cause to ... search does not vitiate the probable cause to arrest,

because (among other reasons) the fruit of the poisonous tree doctrine is not available to assist a

§ 1983 claimant." *Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999).  Whatever the

legality of the searches that yielded the marijuana in the pockets of Messrs. Collins and Gilliam's

sweat shorts, possession of this drug is illegal in Pennsylvania and thus provides the basis for the

police to effect a legitimate arrest.  *Cf. Hector v. Watt*, 235 F.3d 154 (3d Cir. 2000) (affirming the

dismissal of the plaintiff's § 1983 claim seeking litigation expenses stemming from his criminal

---

[60]     The Officer Defendants are not entitled to qualified immunity because, as
discussed *supra*, the right not to be arrested without probable cause was clearly established prior
to these events.

[61]     In fact, the mere *smell* of marijuana, "if articulable and particularized, may
establish not merely reasonable suspicion, but probable cause." *United States v. Ramos*, 443
F.3d 304, 308 (3d Cir. 2006).

prosecution where an unlawful search had uncovered hallucinogenic mushrooms in his airplane).

Because the police had probable cause to arrest Messrs. Collins and Gilliam, the record does not support their false arrest or imprisonment claims, and all of the Officer Defendants are entitled to summary judgment as to this issue.

## IV.    The Borough of Sharon Hill

Count VIII of the Complaint alleges generally that Sharon Hill maintained unconstitutional customs or policies in connection with its training of police officers and/or its arrest and detention of suspects.  The Complaint contains no factual allegations regarding the training of officers, nor does it identify any particular customs or policies as unconstitutional.  It does, however, allege that Messrs. Christian, Collins and Gilliam were strip and cavity searched in the Sharon Hill Police Station, which might conceivably provide the basis for a *Monell* claim against Sharon Hill.  This factual allegation is amply supported by the record.

The Court of Appeals has recently held, however, that prisons may maintain a blanket policy of conducting strip and visual-cavity searches of all detainees, regardless of the crime with which they are charged and even in the absence of reasonable suspicion that a particular detainee might be smuggling contraband.  *Florence v. Bd. of Chosen Freeholders of Burlington*, 621 F.3d 296 (3d Cir. 2010).  As applied to this case, *Florence* would bar Messrs. Christian, Collins and Gilliam from proceeding with a *Monell* claim based on the sole fact that they were visual-cavity searched at the Station.[62]

---

[62]    *Florence* was decided five years after the searches that are challenged in this case, but *Florence* did not reverse Third Circuit precedent.  Instead, it addressed a question of first impression: namely, the proper interpretation of *Bell v. Wolfish*, 441 U.S. 520 (1979).

Although *Florence* does not establish whether or not it is legal to maintain a policy or custom of recording such searches, or of broadcasting a live feed of these searches on monitors that may be viewed by other detainees or in the squad room or by officers of a different gender, the Plaintiffs' Complaint says nothing at all about videotaping or monitors.[63]  A *Monell* claim cannot proceed where the complaint does not mention the particular policy to which the plaintiff objects.  *See, e.g., Bittner v. Snyder County*, 2009 U.S. Dist. LEXIS 5094 (M.D.Pa. January 26, 2009) (dismissing *Monell* claim on the ground that the complaint failed to identify any specific policy or custom); *Funez ex rel. Funez v. Guzman*, 687 F. Supp. 2d 1214 (D. Ore., 2009) (same). Although Sharon Hill has raised this deficiency in the Complaint in the context of a motion for summary judgment rather than one dismiss, "no amount of discovery can cure a complaint that fails to state a claim."  *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 460 (3d Cir. 1977) (Aldisert, J., dissenting).  Sharon Hill is therefore entitled to summary judgment as to Plaintiffs' *Monell* claim, and the Court need not reach the question of whether any policy or custom regarding cameras and

After *Wolfish* was decided, nearly every circuit court of appeals held that the decision barred prisons from conducting strip searches of suspects who had been arrested for minor offenses in the absence of reasonable suspicion that they were carrying contraband.  The Court of Appeals for the Third Circuit never adopted this reading of *Wolfish*, however – and only addressed the question of its proper interpretation after the Courts of Appeals for the Ninth and Eleventh Circuits had explicitly reversed themselves, holding that a policy of strip searching all arrestees as a matter of course is in fact consistent with *Wolfish*.

*Florence* is thus best understood as clarifying controlling Supreme Court precedent rather than abrogating an old rule or even announcing a new one.  *See also Johnson v. Cape May County Corr. Facility*, 2010 U.S. Dist. LEXIS 104948 (D.N.J. September 30, 2010) (applying *Florence* to a challenged search that took place prior to that decision); *Langella v. County of McKean*, 2010 U.S. Dist. LEXIS 100423 (W.D. Pa. September 23, 2010) (same).

[63]      The Plaintiffs first suggested that the recording or the broadcasting of these searches within the Sharon Hill Police Station might be unconstitutional only in its response to the Sharon Hill Motion.

monitors in the Police Station may have violated any constitutional rights.

## CONCLUSION

For the reasons set forth above, the Motions for Summary Judgment will be denied except as to (1) the false arrest claims filed against all of the Officer Defendants by Messrs. Collins and Gilliam; and (2) the *Monell* claim filed against Sharon Hill by these two Plaintiffs and Mr. Christian.  As to these particular issues, the Motions will be granted.  An Order to this effect follows.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE